IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FREDRICK EARL BAIN,

Petitioner,

v.

BRIAN E. WOLFE, Malheur County Sheriff,
et al.,

Respondents.

Case No. 3:16-cv-00458-MA

OPINION AND ORDER

**MARSH, Judge.**

Petitioner brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his 2009 conviction for Sexual Abuse in the First Degree. It is undisputed that Petitioner's Habeas Petition was filed beyond the one-year limitation period of § 2244(d)(1). Petitioner argues that the untimeliness should be excused on the basis of a colorable showing of actual innocence. For the reasons set forth below, this Court denies Petitioner's Habeas Petition as untimely.

///

///

# BACKGROUND

On December 1, 2008, a grand jury returned an indictment charging Petitioner with sexually abusing his seven-year-old daughter JB on or between November 18, 2007 and October 18, 2008. Resp't Exs. (ECF No. 21), Ex. 102. Petitioner pled not guilty to the charge and proceeded to trial. *See* Pet'r's Exs. (ECF No. 35), Ex. 3 at 1.

At trial, the prosecution presented the testimony of JB; JB's mother, Laura Bain (hereinafter "Bain"); Lana Davis, a Department of Human Services Child Protective Services worker; Ontario Police Detective Ramon Rodriguez; and rebuttal witness Kimberly Sundquist, an investigator employed by Petitioner's attorney. The witnesses testified about Petitioner and Bain's marital problems and custody disputes, and JB's disclosure of the sexual abuse.

Petitioner testified in his own defense and offered the testimony of his mother, Carolyn Miller (hereinafter Miller), and his (former) fiancée, Trudi Johnson (now Trudi Fortin). The defense theory was that Bain coached JB to falsely accuse Petitioner of sexual abuse in order to gain custody of JB and her sister BB. In opening statements, defense counsel stressed Bain's bias:

> Who's more biased than the mom who's been wanting custody of these girls all along? Who has tried several times to get custody of these girls and has lost. What [a] better way to get your children than make an allegation against somebody that's going to charge them criminally?

> . . . .

> This is a very, very difficult situation. 7-year-old children are very impressionable; both in custody situations and in situations where the parents are fighting. Things can be easily suggested to children and they believe it's true. And based on the evidence that you're going to hear today, and the situation that was occurring between the parties, and how you're suppose to interview people to determine bias, I think the evidence is going to show you that Fredrick Bain is not guilty of these charges.

Tr. at 45-47.

## I.    Evidence Concerning Petitioner and Bain's Marital Problems and Custody Disputes

Laura Bain testified that she met Petitioner in 1999, and they married on September 14, 2001. *Id.* at 85-86. She and Petitioner began having "relationship problems" in 2000, before JB was born. *Id.* at 89. Petitioner enlisted in the Army in 2003 and was deployed overseas several years later. Tr. 86-87; Resp't Ex. 164 at 2. Bain testified that when Petitioner returned home in 2007, she wanted to make their marriage work. Tr. at 89-90, 105.

However, Petitioner served Bain with divorce papers in August, 2007. *Id.* at 90. Bain testified that she did not appear at the dissolution hearing because Petitioner lulled her into believing they were going to reconcile. *Id.* at 90-91, 122. Petitioner proceeded with the divorce, a default judgment was entered, and the court awarded him primary custody of their two daughters. *Id.* at 90-92, 101, 105, 107-08, 122; Resp't Ex. 136. Bain testified that she tried without success to get the default judgment set aside. Tr. at 107-11, 120-21. The default decree provided that she would have visitation with her daughters every other weekend. *Id.* at 92, 107, 112. According to Bain, Petitioner interfered with her visitation on several occasions and the police became involved at least once. *Id.* at -92-93, 113, 116-21. However, she denied calling the police to get her children from Petitioner, and could not explain defense counsel's production of police reports indicating that she twice requested police to conduct a civil standby during exchanges of the children. *Id.* at 113-18; *see* Resp't Exs. 130, 131. Bain testified that she filed two applications for a restraining order for the sole purpose of protecting herself and her children — not as a means to obtain custody. Tr. at 101-02, 106. According to Bain, the disputes over visitation started to "smooth out" in June of 2008. *Id.* at 93, 121-22. Bain admitted on cross examination that while Petitioner was deployed, his mother took care of the children on

3 - OPINION AND ORDER

weekdays and there were a "few times" when she did not see them for a couple of weeks. *Id.* at 103-05, 111-13.

Petitioner testified that when he returned from Afghanistan, JB and BB were living with his mother, and he had no intention of reconciling with Bain. *Id.* at 205-06, 213-14. Petitioner testified that Bain always wanted custody of their daughters and he did not know why she did not contest the divorce. *Id.* at 213-14. According to Petitioner, he and Bain constantly fought about custody:

A . . . . I'd say 98% of the exchanges there was a confrontation. There were several times there had to be a civil standby just to keep it civil. Um, she wanted them all the time and you know, it wasn't going to work out that way.

Q Um, were there also several restraining orders filed?

A Yes, there was.

Q And in those did Laura seek custody of the girls?

A Um, to my — if I remember correctly every single one that she did.

Q Now in those civil standbys, who called the officers to ask for help?

A I did quite a few times because I got so dang tired of the fighting. I wanted the girls not to be around it. . . .

Q So some of the time you called the officers?

A Yes, and sometimes she did.

*Id.* at 207-08.

## II. <u>Evidence Concerning JB's Disclosure of Sexual Abuse</u>

Bain testified that during a weekend visit in October 2008, JB told her that she and Petitioner had a secret that she was not allowed to share. *Id.* at 93-94. Bain testified that she immediately called

the police before talking further with JB. *Id.* at 94-95. Bain explained why she called the police so

quickly:

> I didn't want something to come out that was serious or even non-serious and have it, you know, it's hard to explain. Things for the last couple of years have been really hard with me and my kids. And so I just wanted to make sure everything was on the record, whether it was serious or non-serious. That's why I contacted the police.

*Id.* at 94.

A Boise police officer responded to Bain's telephone call. *Id.* at 94-95; *see* Resp't Ex. 149.

Bain testified that JB refused to talk to the officer, and he requested that Bain talk to JB about "what

was going on." Tr. at 95, 115, 123. Bain agreed, but insisted on recording the conversation. *Id.* at 95-

96. The prosecution played the tape recording of Bain's interview to the jury (Resp't Ex. 150), some

of which was unintelligible, and Bain thereafter elaborated on JB's disclosure as follows:

> A     [S]he told me that her dad would have S-E-X with her, she put her fingers on her (INAUDIBLE) on this and moved 'em up and down.
>
> Q     Okay. So when she says that she already showed you what she meant by S-E-X is that what she's referring to, putting her fingers and moving them up and down?
>
> A     Yes.
>
> . . . .
>
> Q     Okay. Now on the tape you asked her if daddy put his pee pee in her mouth and she says, Uh uh, does that mean no?
>
> A     Yes. it meant no.
>
> Q     Okay. But then next you asked if his pee pee touched her pee pee. And what did she say to that?
>
> A     She said — she said uh uh or something to those — along those lines.

Q      Okay. So at that point, based upon what she's saying, she's sort of doing something with her hand, what did you interpret that to mean?

A      Honestly, I didn't know how to interpret it.

Q      Okay.

A      I felt that it was her only gesture to try and show me what had happened to her.

Q      Okay. Um, and you knew that she had said that her dad told her not to tell anybody the secret?

A      Yeah.

. . .

Q      Okay. Did you think you had enough at that point to be concerned as a mother?

A      Yes.

*Id.* at 97-99.

JB was eight years old at the time of trial. *Id.* at 49. JB testified that when she was in the first or second grade, her dad touched her vagina and her bottom on more than one occasion at night in his bedroom. *Id.* at 55, 58-60. JB testified that when this happened, her dad was not wearing clothes, she usually was wearing a nightgown, and her dad would remove her underwear. *Id.* at 57-58. JB testified that the touching happened at night when she went into his bedroom after having a nightmare. *Id.* at 55, 57, 69. JB testified that her dad told her that it was a secret and made her promise not to tell anyone. *Id.* at 60. When asked whether the abuse really happened or if someone told her to say it, JB testified that it really happened. *Id.* at 68-69. JB testified that the only time she talked to her mother about the "secret" was the day she disclosed the abuse, and that her mother taught her the word "vagina" after she made the disclosure. *Id.* at 62-65.

Lana Davis testified about her subsequent interview of JB at the STAR Center. *Id.* at 162-66, Resp't Ex. 152. During the videotaped interview, JB stated that her mother brought her to the STAR Center because something was going wrong at her dad's house that he's not supposed to do to children, and that he was doing the "S-word" to her. Resp't Ex. 152. JB stated that when she would sleep with her dad, he would jump on top of her and move up and down. *Id.* She stated that "where he pees" touched "where she pees," and identified those body parts as penis and vagina. *Id.* JB stated that when the abuse occurred, her dad would be naked and she would have her clothes on except for her panties, which he removed. *Id.* In response to Davis' questions, JB stated that her dad abused her more than once, he always did it the same way, and that he would stop when she said "no more." *Id.* JB stated that her dad told her to keep it a secret, but now she would "keep that secret" with Davis, her sister, and her mom. *Id.* When asked if her dad ever touched her sister, JB responded that he would never do it to her because "she is just little." *Id.* At the conclusion of the interview, JB stated that she was glad she told her secret to her mom and that she felt better now. *Id.*

After the prosecution played the videotape of JB's interview, Davis testified about her recollection of the interview. Davis testified that JB disclosed that Petitioner touched her vagina with his penis, but initially referenced her vagina as "where she pees" and Petitioner's penis as "where he pees." Tr. at 167, 176. Davis testified that JB explained "what happened to her was that he did the 'S' word, which is S-E-X [and] [w]hen . . . asked . . . to clarify what S-E-X meant, [JB] stated it's when you get drunk and make out." *Id.* at 168, 171, 178. Davis acknowledged that she did not know that there were custody issues or allegations of coaching when she interviewed JB, and therefore she did not ask questions related to those issues that may have proven useful. *Id.* at 168-69, 172, 175-76. Davis testified that, while it is possible for five- to- seven-year olds to "maintain a lie,"

studies indicate that children ages three to seven are difficult to coach and that their false reports are less detailed than those of children who were actually abused. *Id.* at 173-74, 179-80.

Ontario Police Detective Ramon Rodriguez observed Davis' interview of JB. *Id.* at 132, 164; Resp't Ex. 151. Rodriguez testified that JB disclosed that Petitioner jumped on top of her and moved up and down. Tr. at 132. Rodriguez testified that JB disclosed that Petitioner's "pee pee" touched her "pee pee," and that she later described the respective body parts as penis and vagina. *Id.* at 132-33, 136. Rodriguez testified that five-to-seven-year-old children can "maintain a lie," and that children are more likely to make false allegations of abuse when they are involved in a custody dispute. *Id.* at 142, 145. Rodriguez conceded that no questions were asked of JB pertaining to custody issues or coaching, but also testified that he did not believe the custody issue was "fresh" or that either issue was of "a whole lot of concern." *Id.* at 143-45, 151. Rodriguez testified that it is not unusual for a parent to be the first person to interview a child about sexual abuse. *Id.* at 150.

In his defense, Petitioner testified that he never touched JB inappropriately. *Id.* at 207-08. He testified that he had some harmless secrets with JB, but he never told her to keep a secret about improper touching. *Id.* at 208. Petitioner explained that JB had nightmares once or twice a month and she would come into his bedroom. *Id.* JB's sister always woke up and came with her. *Id.* at 210, 216. On a couple of occasions, he permitted JB to sleep with him. *Id.* at 209-10, 216. Both Petitioner and his mother testified that they never used the anatomically correct names of body parts when discussing improper touching with JB. *Id.* at 187-88, 217.

Trudi Johnson testified that she had been in a relationship with Petitioner since September, 2007, and they became engaged in February, 2008. *Id.* at 196-97. Johnson testified that "just prior" to JB's disclosure, JB began having secretive telephone conversations with her mother. *Id.* at 198.

She "always heard [JB] say, I promise, mommy, I won't say anything, I promise, I promise." *Id.* at 198. Neither she nor Petitioner asked JB about the telephone calls. *Id.* at 202, 215-16. Johnson testified that during the time she stayed at Petitioner's house, JB came into Petitioner's bedroom only twice and on both occasions BB came with her. *Id.* at 199.

Petitioner's mother testified that she regularly took care of JB and BB, and that between June of 2007 to October 2008, she saw no difference in their behavior. *Id.* at 186-87, 189-90. According to Miller, the weekend before JB's disclosure of the sexual abuse, she asked JB whether anyone had ever touched her or made her uncomfortable and JB said "no." *Id.* at 190, 193. Defense Investigator Kimberly Sundquist confirmed that Miller mentioned the conversation she had with JB about improper touching, but conceded she did not include it in her investigation report. *Id.* at 221.

During closing arguments, Petitioner's counsel stressed the importance of the custody dispute between Petitioner and Bain when evaluating the credibility of JB's testimony, and the fact that neither Davis nor Rodriguez posed questions to JB concerning custody when interviewing her. *See id.* at 252-53 , 255, 259-62. Counsel argued that "[t]here was a lot of anger" between Bain and Petitioner, and again posed the question to the jury "[h]ow much easier to get rid of [Petitioner] than to coach a child and charge somebody with a crime?" *Id.* at 261-62. Additionally, defense counsel argued that the manner in which Bain interviewed JB, and JB's use of the anatomically correct terms for vagina and penis, were evidence that Bain had coached JB. *Id.* at 254-55, 257, 260, 263. Finally, defense counsel focused on the failings of Bain as a mother:

> This is a mother who left her children, and all of a sudden when Mr. Bain comes back she wants them back. And she wants everything from him. But she can (INAUDIBLE) and left these kids with their grandmother for six to seven months; who took care of them on a daily basis. Who fed them. Who got them up in the

morning and took them to school. Who clothed them. And [Bain] called them on the phone. That's it.

*Id.* at 255-56; *see also id.* at 262-63.

At the conclusion of the three-day trial, the jury returned a 10-2 guilty verdict. Resp't Ex. 185. The trial judge sentenced Petitioner to 75 months imprisonment and a ten-year term of post-prison supervision. Resp't Ex. 101 at 3. Additionally, Petitioner was required to register as a sex offender. *Id.* Petitioner filed an appeal which he subsequently dismissed. Resp't Ex. 103.

On November 12, 2010, Petitioner filed a state post-conviction relief (PCR) proceeding alleging that he received ineffective assistance of counsel. Resp't Exs. 104, 108. The state trial court denied post-conviction relief, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court dismissed Petitioner's petition for review as untimely. Resp't Exs. 194, 200, 206; *Bain v. Coursey*, 267 Or. App. 637 (2014), *rev. denied*, 358 Or. 249 (2015). The Court of Appeals issued its appellate judgment on March 23, 2015. Resp't Ex. 200.

In June, 2015, JB and BB began living full-time with Carolyn and Kenneth Miller, their paternal grandparents. Pet'r's Ex. 13 at 1. In August, 2015, Petitioner was released from custody and began serving his ten-year term of post-prison supervision. Pet'r's Mem. in Supp. (ECF No. 34) at 19; Pet'r's Ex. 8 at 1. From December, 2015 through March, 2016, Petitioner was allowed supervised visitation of his daughters. Pet'r's Ex. 9 at 1.

On March 9, 2016, the Millers were awarded permanent legal guardianship of JB and BB. Pet'r's Ex. 12 at 1, 4; Ex. 13 at 1-2. On March 17, 2016, Petitioner filed the instant proceeding setting forth two grounds for relief. Pet'r's Habeas Pet. (ECF No. 1). First, Petitioner alleges that trial counsel rendered ineffective assistance of counsel in multiple particulars. Second, Petitioner raises

a free-standing claim of actual innocence. *Id.* at 6-18. Respondent Michael Wu (hereinafter Respondent) moves the Court to deny the Petition because it is untimely and the claims lack merit. Resp't Resp. to Pet. (ECF No. 46) at 1-2. Petitioner seeks to overcome the untimeliness of his Petition with a colorable showing of actual innocence. Pet'r's Mem. in Supp. at 21, 35.

## DISCUSSION

## I.   STANDARDS

A colorable claim of actual innocence serves as a gateway though which a petitioner may pass to overcome the untimeliness of his habeas petition. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *Stewart v. Cate*, 757 F.3d 929, 937 (9th Cir. 2014). "[T]enable actual-innocence gateway pleas are rare." *McQuiggin*, 569 U.S. at 386. In order to make a colorable claim of actual innocence, a petitioner must present new, reliable evidence to prove that "'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *Id.* at 395 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)); *Stewart*, 757 F.3d at 938. "'To be credible, such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eye-witness accounts, or critical physical evidence—that was not presented at trial.'" *Cook v. Schriro*, 538 F.3d 1000, 1028 (9th Cir. 2008) (quoting *Schlup*, 513 U.S. at 324).[1] This Court considers all the evidence, old and new, incriminating and exculpatory, admissible at trial or not, in order to make a probabilistic determination about what reasonable,

---

[1] The Ninth Circuit has noted that the question of whether "new evidence" must be newly discovered or simply newly presented is "one that [the] court will need to address." *Pratt v. Filson*, 705 F. App'x 523, 525 (9th Cir. 2017). However, the Court declined to do so because the petitioner failed to demonstrate a colorable claim of actual innocence under both tests. *Id.* This Court similarly assumes, without deciding, that Petitioner's evidence need only be newly presented.

properly instructed jurors would do. *Schlup*, 513 U.S. at 329-30; *Shorb v. Nooth*, 727 F. App'x 442, 443 (9th Cir. 2018); *Stewart*, 757 F.3d at 940; *Cain v. Oregon*, 546 F. App'x 641, 643 (9th Cir. 2013).

In considering the totality of the evidence in this context, the Ninth Circuit has identified several principles relevant to this proceeding. First, the Ninth Circuit has held that polygraph evidence is not sufficiently reliable to support a claim of actual innocence on its own. *Shorb*, 2018 WL 3061996, *1; *Hatch v. Lampert*, 215 F. App'x 614, *1 (9th Cir. 2006). Second, the court has opined that "[d]eclarations are not a strong form of evidence because 'the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." *Garcia v. Evans*, 670 F. App'x 622, 623 (9th Cir. 2016); *Cotton v. Schriro*, 360 F. App'x 779, 780 (9th Cir. 2009) (stating that because post-trial affidavits are not subject to cross-examination, they should be treated with a fair degree of skepticism).

Third, the court has held that "[a]s a general matter, recantation testimony is properly viewed with great suspicion." *Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014) (internal quotations omitted). Recantations by family members "reduces their weight and reliability." *Jones*, 763 F.3d at 1249. When a victim's recantation is offered many years after trial, a reasonable juror may believe that the victim's memory of the abuse has faded and credit testimony closer in time to the abuse. *Id.* at 1250. For this reason, a witness's recantation does not render his or her earlier testimony false. *Id.* at 1248; *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005). "Rather, a witness' recantation is

considered in addition to his trial testimony and in the context in which he recanted when assessing the likely impact it would have on jurors." *Jones*, 763 F.3d at 1248.[2]

Finally, with respect to impeachment evidence, the Ninth Circuit has opined that a petitioner may satisfy *Schlup* with evidence "that significantly undermines or impeaches the credibility of witnesses presented at trial, if all the evidence, including new evidence, makes it 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002) (*quoting Schlup*, 513 U.S. at 327); *Sistrunk v. Armenakis*, 292 F.3d 669, 676 (9th Cir. 2002). However, speculative and collateral impeachment by itself falls far short of showing actual innocence. *Gandarela*, 286 F.3d at 1086.

## II.    NEW EVIDENCE

Petitioner's new evidence has "two primary prongs:" (1) JB's recantation; and (2) evidence that "calls into question the reliability of JB's original accusation and impeaches the testimony of the State's witnesses." Pet'r's Mem. in Supp. at 35. With regard to the second prong, Petitioner relies on (1) two psychologists' expert analyses of JB's accusation and the manner in which the pretrial interviews were conducted; (2) evidence of Bain's bias against Petitioner and her threats to obtain custody of the children; (3) evidence regarding what prompted Miller to have a discussion with JB about improper touching one week before JB's disclosure; (4) the results of Petitioner's three polygraph tests; and (5) the fact that the jury returned a non-unanimous verdict. *Id.* at 35, 41-47.

---

[2] Petitioner argues that this Court should compare the circumstances of JB's initial disclosure to the reliability of her recantation to determine which of the two should be "given more weight." *See* Pet'r's Mem. in Supp. at 40, Pet'r's Reply (ECF No. 48) at 2-3. This Court agrees to the extent that the circumstances surrounding both JB's initial disclosure and her recantation are part of the totality of the evidence that this Court considers when determining whether Petitioner has made a colorable showing of actual innocence.

## A.    JB's Recantation

On November 4, 2016, approximately seven and a half years after Petitioner's trial, Petitioner's counsel interviewed JB. Pet'r's Ex. 11.[3] At the time of the interview, JB was 15 years old and living with her paternal grandparents. During the videotaped interview, JB expresses her belief that her dad is innocent and that the abuse never occurred. JB states that "it didn't happen . . . I know it didn't happen."

JB explains that she started believing in her dad's innocence when she still lived with her mom, and before she began living with her grandparents "long term." JB states that she can't say exactly when she started believing her dad was innocent or why, but explains that she started learning about the results of his polygraph tests and she started reading the case file and transcripts. Additionally, she began realizing that when her grandparents asked her about the case, her story always changed. That's when she started believing that "something's wrong."

When asked why she would falsely accuse her father, she responded that she thinks "it's mostly because of [her] mom." JB explains that when you are seven or eight years old, you listen to what your mom says. Her mom always told her that her dad was the bad guy and she was the good one. So, she believed what her mom said. When she got older, she realized that what her mom said wasn't true. "How that came into play," she doesn't really know. However, after considering how her mom acted toward her and how she told her story differently each time, she "kinda started believing that it wasn't true." JB volunteered that her grandparents did not pressure her into thinking

---

[3] In Petitioner's Exhibit 20, JB swears to the truth of her statements in the video.

her dad is innocent. JB states that she is coming forward because her "dad is innocent . . . and that's where [she] stands."

Petitioner submits the affidavit of his mother, Carolyn Miller, to explain the "evolution" of JB's belief that he is innocent:

> After [JB and her sister] moved in with us, [JB] asked me whether we had gotten her father's name cleared. [JB] read the trial transcript and other materials related to the *case—some of which she looked through when she stayed at my home prior to her permanent residence there* — and she told me, "my dad didn't do this."

> This was not the first time [JB] brought up her father's case; she had been asking to clear her father's name for two or three years before she and [her sister] moved in with us in June of 2015.

> *Since the trial, I asked [JB] on a few occasions to tell me what happened.* I wanted to know for sure, because if my son did this, I would have killed him.

Pet'r's Ex. 13 at 2 (emphasis added).

Kenneth Miller agrees that Carolyn Miller never pressured JB "to do anything" and that, for the last year or two, JB has wanted to "clear" her father's name. Pet'r's Ex. 12 at 2. He concedes that Miller and JB "discuss[ed] the timing of the case" and that Miller "relay[ed] information to [JB] any time [Petitioner's] lawyers contact her." Pet'r's Ex. 12 at 2.

Petitioner's step-sister, Theresa Osborne, similarly attests that she never heard Miller pressure [JB] to say that Petitioner did not abuse her, and that Miller always told JB to tell the truth. Pet'r's Ex. 18 at 2. Osborne attests that she believes Petitioner is innocent and JB is aware of her opinion. *Id.* at 2. Osborne explains that she believes Petitioner is innocent because JB's behavior is so different from her experience as a victim of sexual abuse:

> I don't believe [Petitioner] did anything to [JB] because I was molested as a child, and it affects your interactions with other people, particularly men. I did not want to be alone with the person who molested me. I did everything in my power to

never be alone with him, and I prevented others from being alone with him as well. I remember so clearly what happened. She is close with my son, who is 19-years-old, and with my husband.

. . . .

I recall [JB] every now and then asking Carolyn, after [Petitioner's] conviction, if she would see her dad. Carolyn would tell her he is in prison, and she could not see him *because of what happened in court*. I recall JB responding, "What they say happened never happened. I don't know why he's there."

*Id.* at 2-3 (emphasis added).

In contrast, Lorrina Heisey, Bain's former partner, attests that she noticed Miller's influence over JB while she was still living with her mother. Pet'r's Ex. 16 at 2. Heisey states that after JB disclosed the abuse, JB and BB moved in with Bain, and on a number of occasions JB stayed with her grandmother. According to Heisey, after these visits, JB stated that her grandmother told her she did not believe Petitioner abused her. Heisey continues:

When I was still in contact with the girls, about two or three years ago, I know [JB] was very confused about everything because Carolyn would tell [JB] she was never abused. [JB] and [her sister] also stated that Carolyn would let them speak to [Petitioner] on the phone while . . . he was in prison and he would also tell her that he did not hurt her.

*Id.*

## B.    Reliability of JB's Original Accusation & Impeachment Evidence

### 1.    Expert Testimony

Petitioner offers the affidavit of Daniel Reisberg, Ph.D., and the declaration of Dr. Robert Stanulis to "identify at least five issues that undermine the reliability of JB's initial complaint." Pet'r's Mem. in Supp. at 42. Petitioner identifies the issues as (1) the importance of distinguishing a child's lie from a "false memory;" (2) the improper interviewing techniques used at JB's pretrial

interviews; (3) Davis and Rodriguez's failure to discuss custody issues during the STAR interview; (4) the many biases that infected JB's accusation; and (5) the fact that the STAR interview was presented to the jury as an indication of the reliability of JB's initial disclosure. *Id.* at 41-45.

Dr. Reisberg opines that "[a]n untrained parent . . . is likely to ask questions that can influence or guide [a] child's report [of abuse]." Pet'r's Ex. 10 at 2, *see also* Resp't Ex. 163 at 4. Reisberg explains that "the parent can easily 'leak' information about [his or her] concerns, and in that fashion shape a child's report even when the parent hopes to remain entirely neutral." Pet'r's Ex. 10 at 2. According to Reisberg, research on "stereotype induction" indicates that if an adult "offers some sort of broad evaluative comment (such as, 'He's clumsy' or 'He's sometimes naughty'), the "comment can lead a child to *invent* some sort of report that will be consistent with this evaluation." *Id.* (emphasis in original); *see also* Resp't Ex. 163 at 14-15.[4] "Once that episode is reported . . . the child is likely to continue offering the same report." Pet'r's Ex. 10 at 2; *see also* Resp't Ex. 163 at 16. Reisberg explains that although false reports can emerge even in the absence of a biased parent, it is more likely if the parent questions the child with ill intent and through the use of suggestive questions. Pet'r's Ex. 10 at 2. In this regard, Reisberg states:

> Ms. Bain came into this questioning with her daughter already hostile toward Mr. Bain; we know this because of the history of antagonism in their marriage and after their divorce . . . . Ms. Bain was (and perhaps still is) entirely untrained about child interviewing, and she made comments in her testimony to suggest she was ignorant about (and perhaps indifferent to) the difference between proper and improper questioning of a child. These points, too, amplify the concerns about how this initial "interview" with JB unfolded.

---

[4] In addition to relying on Bain's influence on JB's recollection of the abuse, Petitioner relies on the responding officer's report indicating that he asked JB if she would "tell her mom her *bad* secret." Resp't Ex. 149 at 3.

*Id.* at 3; *see also* Resp't Ex. 163 at 9-10.

Dr. Stanulis offers a similar opinion on false memories and discusses the importance of following the Oregon Interview Guidelines when conducting an interview:

> Memory can be created or contaminated through interview tactics, repeated questioning by biased interviewers and many other factors. Oregon Interview Guidelines exist in recognition of the fact that false memories of abuse can be created and that false memories are not lies per se . . . . In this case, having the mother conduct the initial interview could well have produced a false memory that would not be a lie, but an inaccurate memory that then would be undetectable. It is in effect tampering with the main evidence (the child's memory) in this case. It is important to note that while an interview that follows the guidelines will greatly reduce the likelihood of contamination of memory during that interview, prior taint will not be detected as there is no way to do that. The trial transcript clearly indicates that some aspects of the Guidelines were not followed (e.g. the interviewer was unaware that there was a custody issue.).
>
> . . . .
>
> [O]nce memory is contaminated it cannot be detected as contaminated and there is no way to uncontaminate it. Hence, [the] failure to investigate correctly at the beginning or failure to follow guidelines is far more than a mere oversight as it can result in the primary evidence being created or tainted in a way that is both not detectable and unfixable.

Pet'r's Ex. 17 at 2, 5. Additionally, Dr. Stanulis opines that, despite the prosecutor's assertion that the consistency in JB's description of the abuse indicates she is being truthful, it is equally true that "if [an] alleged victim has internalized a false memory that would be consistent over time." *Id.* at 6.

## 2.     Evidence of Bain's Bias and Threats

Petitioner contends that Bain's trial testimony is impeached by new evidence of her bias and the threats she made to Petitioner. Pet'r's Mem. in Supp. at 45. Specifically, Petitioner asserts that there is evidence proving that (1) Bain was hostile toward Petitioner and had no reservation about hurting him, including sending him pornographic photographs and telling him she wished he had

died in the military; (2) Bain and Petitioner were at "extreme odds" over custody of their children as demonstrated by their volatile exchanges of their children; (3) Bain "learned that she needed extreme allegations to use court process to gain custody of the children;" and (4) Bain made threats against Petitioner regarding the custody of their children. *Id.* at 45-46.

Petitioner's step-father, Kenneth Miller, recalls two incidents that occurred prior to trial during which Bain was disruptive at their home. Pet'r's Ex. 12 at 2. He describes one incident when Bain called them "every name in the book and got in [their] faces." *Id.* Petitioner, JB, and her sister were present at the home and "[e]ventually the police came and escorted [Bain] off the property." *Id.* Miller confirms her husband's recollection of the incident, adding that Bain "took a swing" at Kenneth Miller, tried to punch Petitioner, and screamed obscenities at Sheriff Deputy Curtis Wheeler, one of the responding officers. Resp't Ex. 165 at 5. Deputy Wheeler's incident report confirms that Bain was confrontational and that he subsequently arrested her for driving with a suspended license. *See* Resp't Ex. 128.

Trudi Fortin also recounts an altercation during which Bain was verbally and physically abusive toward Petitioner. Fortin attests that Bain yelled she wished Petitioner "had been killed in Iraq, and that she would kill him before he took [JB and BB] from her forever." Pet'r's Ex. 14 at 2. Petitioner attests to the same details of the incident, noting that Bain had the smell of alcohol on her breath. Resp't Ex. 164 at 8; *see also* Resp't Ex. 142 (police incident report).

Fortin attests that on another occasion, Bain told Petitioner "that she would do everything in her power . . . to get her girls away from him" and that "he did not deserve them because she was a better parent." Pet'r's Ex. 14 at 2. Brandi White, Bain's sister-in-law, attests that Bain "told her several times that she would do whatever it takes to get custody of [JB and her sister]." Resp't Ex.

167 at 1, 3. On March 11, 2008, Bain sent Petitioner an email reading "I told u that u wont get my kids bk as long as im breathing and have a pulse go create more and leave my 2 the fuck alone." Resp't Ex. 164 at 8, 13.[5]

Petitioner attests that he believes Bain coached JB to accuse him of sexual abuse because of their marital and custody disputes. *Id.* at 2. Petitioner attests that while he was overseas, Bain told him she had become a "bi-sexual swinger," and she began sending pictures of her having sex with other women. *Id.* Petitioner attests that he later found on the family computer "emails, instant messages, chat records and [between fifty and 100 sexually explicit] photographs that clearly depict[] the relationship [Bain] had with others." *Id.* at 4, *see* Pet'r's Ex. 1; Resp't Exs. 113-27, 140, 168 at 1-2. Petitioner states that while he was deployed, Bain spent his salary "on her swinger friends," and never gave his parents money while their daughters were living with them. Resp't Ex. 164 at 4. Petitioner attests that Bain obtained two restraining orders by lying that he was physically abusive toward her. *Id.* at 6-8; *see* Resp't Exs. 129, 137, 138. Petitioner attests that he took his daughters to counseling after he discovered they were sleeping in the same bed with Bain and other women. *Id.* at 9.

Petitioner attests that in October, 2008, he received a letter and telephone calls from Bain seeking forgiveness of her child support obligation. *Id.* at 10; *see also* Resp't Ex. 148. That month, Bain reported JB's disclosure of sexual abuse. Resp't Ex. 164 at 10. Petitioner opines that Bain coached JB to accuse him of sexual assault in order to end her child support obligation and to get

---

[5] Petitioner sets forth all of the alleged threats made by Bain at pages 89-90 of his Supporting Memorandum.

custody of their daughters — not because she especially wanted the girls, but because she hated him so much she just didn't want him to have them. *Id.* at 2, 10.

### 3. Miller's Discussion with JB About Improper Touching

As outlined above, Miller testified that, approximately one week before JB disclosed the sexual abuse, she asked JB whether anyone ever touched her "no zones" or made her uncomfortable and JB responded "no." Tr. at 190-91. Petitioner presents new evidence concerning Bain's sexual activity that caused Miller to be concerned about JB's safety. Resp't Ex. 165 at 5.

According to Miller, in June 2006, Bain expressed "how she admired gays, lesbians . . . bi-sexuals" and "swingers." *Id.* at 2. Miller attests that she was informed by her step-daughter, Cheyenne Miller, that during a camping trip, Bain was "openly kissing women," and that "adults were engaged in sexual activity that could be heard by JB and [her sister]." *Id.*; *see also* Resp't Ex. 166 at 2 (Aff. of Cheyenne Miller). Additionally, Miller attests that she saw an instant message on Bain's computer from "'Jim and Jen'" that said, 'Awesome threesome last night'" and that Bain had "Eye of Horus" as her screen name. Resp't Ex. 165 at 2-3. According to Miller, JB told her that when she visited her mother she had to sleep in the same bed with Bain and her female lover. *Id.* at 5; *see also* Resp't Ex. 167 at 1 (Aff. of Brandi White). Miller asked JB about "good touches and bad touches" because she "wanted JB to be able to tell [her] if she was being sexually mistreated by anybody, including either Laura Bain or any of her swinging friends." Resp't Ex. 165 at 5. Miller attests:

> On October 13, 2008 JB and [her sister] both crawled up on my lap and asked "If daddy goes away again, will we get to live with you? The significance of this did not occur to me until after Petitioner's trial. On the day I returned JB to Laura Bain, I talked to JB and asked her whether she had been touched sexually by anyone. She replied emphatically, "No Grandma."

*Id.* at 6; *see also* Resp't Ex. 155.

Heisey attests that she was in a relationship with Bain from approximately 2007 to 2009, and admits JB sometimes slept with them, "but there was never any inappropriate behavior." Pet'r's Ex. 16 at 1; *see also* Resp't Exs. 164 at 9, 166 at 2, 167 at 1. Heisey also attests that she was present the day JB disclosed the sexual abuse:

> One day, [JB and her sister] were with [Laura Bain] and me for a visit. [JB] spoke to herself quite often, and that day she was behind the couch talking to herself about secrets. Hearing the word, "secrets," sent shivers down my spine. This reminded me of my own story. I was sexually abused as a child. Laura was aware of my past. I encouraged Laura to ask [JB] about her secrets. [JB] said she couldn't tell. Laura asked why she couldn't tell her secret. [JB] said daddy would get upset. Laura asked her where the secret happened. [JB] said in his bed. I told Laura she needed to call the police.

Pet'r's Ex. 16 at 2; *see* Resp't Ex. 149 at 4 (police incident report).[6]

### 4. Polygraph Results

Petitioner took three polygraph tests. *See* Resp't Ex. 160; Pet'r's Exs. 8 and 9. On February 18, 2010 (after Petitioner's trial but before the state PCR proceeding), E.S. Taber administered a specific issue polygraph examination to Petitioner. Resp't Ex. 160 at 1; *see also* Pet'r's Ex. 8 at 2. Taber concluded that Petitioner's denial that he touched JB's vagina with his penis or touched JB's vagina with any part of his body for sexual reasons was truthful. Pet'r's Ex. 8 at 1-2. On or about November 12, 2015 (after the conclusion of the state PCR proceeding), Dennis DeBord administered

---

[6] Reisberg opines that Heisey's presence when JB disclosed the abuse and urging Bain to pose particular questions to JB "increases the already considerable worry that the initial questioning of JB was biased and improper, and hence the initial reports by JB unreliable." Pet'r's Ex. 10 at 3-4.

a mixed issue polygraph examination to Petitioner. Pet'r's Ex. 8.[7] DeBord concluded that Petitioner

had "no significant reaction" to the following questions: (1) Have you ever had any type of sexual

contact with your children" and "[d]id you ever touch [JB's] bare vagina for sexual pleasure." *Id.*

at 4. On or about March 24, 2016, DeBord conducted a second mixed issue polygraph examination

to confirm Petitioner's compliance with the conditions of his probation. Pet'r's Ex. 9. The questions

pertained to conduct since November, 2015, and showed "no significant reaction." *Id.* at 2-4.

## III.   **ANALYSIS**

This Court accepts that JB's recantation is truthful to the best of her present recollection and

that she does not feel pressured by her family to recant her trial testimony. However, there is

evidence in the record from which a reasonable juror could conclude that JB's current recollection

is the product of family influence, her review of the trial court record, her knowledge of Petitioner's

polygraph results, and her estrangement from her mother. In light of these influences, a reasonable

juror could choose to credit her trial testimony that was closer in time to the abuse and consistent

with her pretrial interviews. This Court does not place particular importance on the absence of

physical evidence of abuse, referenced several times in Petitioner's briefing, given the fact that JB

did not accuse Petitioner of conduct that would result in physical injury.

---

[7] According to DeBold, a screening or "mixed issue" polygraph addresses several issues
of concern and the examiner's opinion is expressed as "significant reaction," "no significant
reaction" and "no opinion." Pet'r's Ex. 8 at 6. A "no significant reaction" to all questions on a
screening examination indicates that the individual "needs no further testing in this area." *Id.* A
"specific issue" examination, in contrast, deals with a single behavior and therefore "shows a
high rate of reliability in determining Truth or Deception." *Id.* at 5. Accordingly, the examiner
can form an opinion as to whether the individual is truthful or not truthful. *Id.*

There is conflicting evidence concerning the extent and timing of the influence exerted by JB's family. However, JB has known from a young age that her grandmother and aunt believe in Petitioner's innocence. The importance of her aunt's opinion is bolstered by the fact that she is a victim of sexual abuse and her memories of the abuse are "clear." Pet'r's Ex. 18 at 2. JB volunteered in her recantation that she started believing in her dad's innocence before she moved in with her grandparents "long term." However, there is evidence that Miller often talked to JB about Petitioner's innocence when JB was still living with her mother. Pet'r's Ex. 16 at 2. Moreover, Miller concedes that JB began looking at trial material at Miller's house before she was living there permanently. Pet'r's Ex. 13 at 2. JB also learned of Petitioner's polygraph test results during her visits with Miller. Pet'r's Mem. in Supp. at 37.

In her recantation, JB was unable to define exactly how her mother's influence "came into play," other than to say that her mom always told her that her dad was the "bad guy," and as she grew up she realized that wasn't true. Given this lack of certainty, and JB's description of how she came to believe in her father's innocence, a reasonable juror could conclude that JB's memory of the sexual abuse has faded over time, not that it has "evolved." *See* Pet'r's Mem. in Supp. at 36, 54; Pet'r's Reply (ECF No. 48) at 3, 10 (describing JB's current recollection as an "evolution").

Petitioner's new evidence concerning Bain's sexuality, the number of her sexual partners, exposing JB to sexual activity, and sending Petitioner threatening emails and pornographic pictures, is collateral impeachment evidence that is not the type of compelling evidence needed to support a colorable showing of actual innocence. Although JB did not disclose the abuse when questioned by her grandmother a week prior to JB's disclosure to her mother, a reasonable juror could conclude that a child would be more comfortable disclosing to her mother rather than a grandparent (and

mother of the abuser). Indeed, when asked in the STAR interview who she could tell if she was improperly touched by anyone else, JB responded her mother.

Petitioner's new impeachment evidence of Bain's threats and physical confrontations with Petitioner and his family, while relevant to prove Bain's instability and her desperation to obtain custody of JB and her sister, it does not discredit JB's disclosure of her "secret," as witnessed by Heisey, or the details of the abuse disclosed by JB in her STAR interview and at trial. Similarly, new evidence of the police involvement in custody exchanges has collateral impeachment value, but is not strong evidence that Bain coached JB to falsely accuse Petitioner of sexual abuse. Heisey's attestation that she was present when JB said that she and her dad had a secret, and that she encouraged Bain to call the police, supports Bain's testimony concerning the events surrounding JB's initial disclosure.

Petitioner's newly presented expert testimony would be helpful to a reasonable juror to understand the creation of false memories and the impact that interviewing techniques can have on the outcome of an interview. Further, as noted by Petitioner, it provides an alternative basis for why a seven-year-old would falsely accuse her father of sexual abuse. However, the opinion testimony is not compelling evidence of Petitioner's factual innocence. The persuasive nature of the expert testimony concerning false memories and confirmation bias, as it pertains to Bain's initial interview of JB, is tempered by Officer Rodriguez's testimony that it is not uncommon for a parent to be the first interviewer of a child.

Petitioner's claim of actual innocence is bolstered by the specific issue polygraph test results and to a lesser degree the mixed issue test results. Nevertheless, given the unreliability of polygraph

tests as a whole, the results do not tip the scale to such a degree that Petitioner has satisfied the extraordinarily high bar of a colorable showing of actual innocence.

Finally, Petitioner argues that this Court should take into account that two of the twelve jurors who presided over his trial were not convinced of his guilt beyond a reasonable doubt. Pet'r's Mem. in Supp. at 47. Petitioner explains that the lack of unanimity "strongly suggests that even a slight change in the available evidence would have tipped the scales to acquittal." Pet'r's Reply at 13. The Court finds this legal argument unconvincing. A colorable showing of actual innocence is not satisfied merely by showing that, in light of the newly presented evidence, a juror might not be convinced of Petitioner's guilt beyond a reasonable doubt. *Schlup*, 513 U.S. at 329. Rather, he must demonstrate that his is the rare case in which it is more likely than not that *no* juror acting reasonably would have voted to find him guilty beyond a reasonable doubt. *See Foster v. Oregon*, 587 F. App'x 356, 359 (9th Cir. 2014) (holding that if the petitioner "only renders it possible that a reasonable juror would not have convicted; it does not so undermine the State's case that is it more likely than not that no reasonable juror would have convicted"). In any event, Petitioner's reliance on the lack of unanimity is not new evidence — it is an argument. *See Powell v. Walker*, 685 F. App'x 594, 595 (9th Cir. 2017) (highlighting the difference between new evidence and an argument).

In sum, although the Court has addressed Petitioner's new evidence separately above, this Court has considered all of the evidence, old and new, admissible or not, in its totality and concludes that Petitioner has failed to demonstrate that it is more likely than not that no reasonable juror would have found him guilty. In so holding, this Court does not question the sincerity of JB's recantation or the intentions of family members who continue to support her. However, the totality of the evidence only renders it possible that a reasonable juror would not have convicted Petitioner. The

26 - OPINION AND ORDER

showing therefore does not rise to the level of a colorable showing of actual innocence so as to excuse the untimeliness of his Habeas Petition.

## IV. REQUEST FOR EVIDENTIARY HEARING

Petitioner seeks an evidentiary hearing "to provide further evidence in support of his claims," and to permit JB to testify "if the Court believes it would be helpful to question her directly and so that the State may subject her to cross-examination." Pet'r's Mem. in Supp. at 136; Pet'r's Reply at 5. As noted above, this Court does not question the sincerity of JB's recantation. Accordingly, an evidentiary hearing to take further testimony is not warranted. *See Griffin v. Johnson*, 350 F.3d 956, 966 (9th Cir. 2003) (holding that an evidentiary hearing is not warranted when the petitioner has not established that the hearing would produce evidence that is more reliable or probative than what is already before the court); *Stewart*, 757 F.3d at 942 (holding that trial court need not hold an evidentiary hearing if the petitioner fails to make a colorable claim of actual innocence even when the new evidence is fully credited).

## CONCLUSION

Based on the foregoing, this Court DENIES Petitioner's Petition for Writ of Habeas Corpus (ECF No. 1) as untimely and DISMISSES this proceeding, with prejudice.

///

///

///

///

///

This Court GRANTS a Certificate of Appealability on the issue of whether Petitioner has made a colorable claim of actual innocence to excuse the untimeliness of his Petition.

IT IS SO ORDERED.

DATED this *27* day of July, 2018.

Malcolm F. Marsh
United States District Judge